I call the next witness. Freetown 261 Carl Bryant, et al. Appellee by Corp. of Duck v. The Lakelands Community Homeowners Association. Appellant by Jeff Altman. Mr. Altman. Thank you. May it please the court, counsel. I was thinking about how to start off this case. And as you know, this case deals with overflows and river and cases dealing from the 1890s, which is befitting of this present courtroom. And it dawned on me that really what we're talking about here are two main central issues. There are several arguments, and I'm willing to get into all of them if you'll permit me, but there's really two central issues. The first is what are the legal standards that apply in this situation where you've got a downstream landowner suing to enjoin an upstream landowner from erecting a berm on a river to protect themselves from overflows. There's three potential standards that have been thrown out there. There's the reasonableness standard that we've seen in the Templeton case. There's the Sparks v. Gray standard, which we've been asserting applies, that deals with, you know, when you're not changing the natural flow of the water course. And then there's the position that's been taken by the plaintiffs here, which is that an upstream landowner can't erect a berm in any situation as a matter of law. The second main core central issue, and I'll get into all that in a little bit, but the second main core central issue is whatever that standard is, whether the plaintiffs met it here. And I argue that they did not and that the preliminary injunction that's been entered that's prohibiting us from building that berm should be reversed. First off, with respect to the standard, now let me turn first to the Templeton and the reasonableness standard. Prior to Templeton, essentially the law in Illinois, and this dates all the way back and, you know, I'm sure you've read the case law, you could, a dominant landowner, which we have here, a dominant estate, could basically do whatever they wanted to the surrogate owner. In the Fenton v. Thompson case, you had a situation where the dominant estate owner was putting great quantities of additional water by digging a ditch, and that led to a veritable torrent of additional water on the surrogate estate. And the court said, that's fine, you can do that. When you get back to the Illinois Supreme Court case in Templeton, the Illinois Supreme Court said, well, wait a minute, that seems a little bit too much. So we're going to change that standard. We're going to adopt the husbandry exception that had existed elsewhere, and we're going to say, if you're the dominant estate owner, you can increase the rate or amount of water going on the surrogate estate, but only within a range of reasonableness. And that was the standard that they came out with. Now, the Bollwig case is a case that came out in 2004 by the second district that actually applied that standard. And in Bollwig, my expert, Don Dressel, who was also the expert in that case, coincidentally, and in that case, his testimony, his calculation showed you're going to increase the amount of water by 50% in a one-year flood, and 36% in a 100-year flood on the surveying estate. And the court said, yeah, that's too much. That's not within the range of reasonableness. Here, Mr. Dressel's calculations, when you compare the amount of water that fills up that lake compared to the 252 square miles of river, that volume of water, when you're talking about the berm that's being proposed here, in a 100-year flood, you're only talking about 2.3% of an increase in water. And in a 500-year flood, you're talking about a 1.4% increase in water. So I would argue that if 50% and 36% is unreasonable, clearly 1.4% and 2.3% clearly are reasonable. So if you apply the test that's laid out in Templeton, I think as a matter of law, you have to find that the injunction here should be lifted. The Sparks case, that's the second standard. In the Sparks case, you dealt with the situation. It's not 100% on point because the people were right adjacent to each other, but there were several items of that case that were brought out that are important, I think, here. There's a couple of important elements. First off, the Sparks case found in that situation, the canal is the natural water course. That's the real survey of land, if you will, in that case. If it can handle the increased water, the water does not accumulate on the plaintiff's lands. We're in that same situation here. If when the water hits our berm and goes back into the river, and that's universal testimony. Everybody agrees that's what will happen. These are not adjacent landowners. So if the river can handle that water, it will not end up flooding the plaintiff's property. Second off, the Sparks case said, well, and also the reason why the dominant state can apply and can go ahead and do what they want to do here is because the defendants here are not changing the natural flow of the surface water or not causing it to go back upon the land. That's what we're doing. We're not changing the natural flow of the surface water. The surface water overflows the river, comes over, will hit our berm, and it will go right back where it belongs, right back into the river. Now, the plaintiffs tend to gloss over that fact. They say, well, it's going to hit your berm and then it's going to end up on our land. But they're missing the very important middle step there, which is it comes right back into the river. That's where it's supposed to go. Your berm is eliminating a major catch basin, isn't it? It's not. There's no evidence that it is. And if you look at the expert testimony particularly, first off, our lake is for the Lily Cache Creekway, not the DuPage River. It's not meant to take on any capacity of the river. That's the testimony that's been from our expert. And their expert also admitted that you shouldn't mix floodways. Now, and if you look at the expert testimony from Don Dressel, he says if you look at the FEMA map, the flow of the water actually goes towards the river. So it's two separate floodways. Again, what you're comparing is the volume of the lake, volume of the water in the lake, compared to 252 square miles of water in the river. I mean, from that point where it comes across Maple Plainfield Road and enters into our subdivision, that's 252 square miles from that point. So in comparison, the volume in the lake is minimal. You also have to look at, and I'm getting a little ahead of myself. That's all right. You also have to look at the peak flows. And our expert testified that if you look at when the lake actually floods compared to when the river actually floods, our lake is a big bowl. It fills up quickly. And when it's filled up, there's no more capacity. So that water goes back into the river. It's just a little blip then on the way, and the river's still rising at that point. And this is all uncontested. Matter of fact, their expert relies on our expert for all his hydrologic needs. He's done that at least 20 times. And there's no dispute over the calculations here. But I'm getting off track. If you look at when the river peaks, which is after our lake fills up, that goes into our expert's ultimate conclusion, which I think is unchallenged, that the impact of removing our lake from taking on these floodwaters, it will have no impact on the plants downstream, no adverse impact, I think was his actual testimony. And bear with me. It will not cause the plant's flood levels to rise. So getting back to the Sparks case, Sparks said, here, in this situation where you're dealing with, you're not changing the natural course of the waterway. What you're merely doing here is displacing the water that would have been in the natural waterway. That's what we have here. There was a case, and the case, the states have differed as to how they consider overflow waters. Some states consider overflow waters to be surface waters. Others do not. I stated a couple of them in my brief that clearly do not. But in the Smith v. Union Automotive Insurance case that we cite in our brief, in that case, in an insurance context, albeit, the 2nd District Appellate Court said, yeah, there's a distinction between surface waters and overflow waters. And that distinction is important because, again, what we're doing here is we're not interrupting the natural flow of the water. We're putting the water right back into its natural waterway. All right. The 3rd standard that the plaintiffs have urged, without citing any legal support, is that you have no right to build your berm, period. Why? Because their expert says the water's going to come down, hit your berm, and go downstream. And any amount of water that goes downstream is going to increase the flow and rate of that river. And you don't have a right to do that. Well, they don't have any case law for that. And, I mean, if you take that to the extreme, as pointed out in the sparks, that wouldn't even allow somebody to sandbag their property. Well, you know, Mr. Bryant, who's one of the plaintiffs, testified, yeah, I've sandbagged my property in the past. And I asked him, well, were you concerned about getting sued by somebody downstream at that point? No. I mean, the sparks case said, if you go with the standard that's being urged by the plaintiffs here, they just called it absurd. And I'd agree. There's no support for it, and I don't think it should be adopted by this court. Now, getting into the 2nd major issue. Did they actually prove, did they actually meet any of those standards? I touched upon a few of these points before, but I think the briefs bring out the testimony that they clearly did not here. We're dealing with a situation where an injunctive relief should only be issued where the plaintiffs have clearly established their right to that injunctive relief. And you need to have more than just bald assertions of causation. Here, that's all they have. You know, they've got one of the plaintiffs, Ms. Ruebauer's feeling that when we sandbagged the property during the record floods of September of 2008, that caused flooding on her property. Feeling. A feeling isn't proof. A feeling is nothing more than a bald assertion. So then they bring up Mr. Allen, who's their expert. And Mr. Allen testified after a cross-examination, and he said, well, you know, back in the sandbagging, the one-week sandbagging back in September of 2008, the water, you know, the sandbags were there in the same area where the berm is going to be now. And my plaintiffs experienced flooding. And I said, well, that's interesting. You've got thing A, which is, you know, flooding, or excuse me, sandbags. Thing B, which is flooding. I didn't see in your report anything about thing A causing thing B. Did I miss something? And he said, no, that's not in there. He conceded that he had no evidence, or he could not testify or opine, that thing A caused thing B. And instead what we have are the plaintiffs coming out and saying, well, ever since that September 2008 flood, the river has caused us additional flooding. It's caused additional, we've lost additional land. We're not cutting a new channel here. There's a case cited by the plaintiffs about cutting a new channel. We're not cutting a new channel. It's water that's going back into the river, and they're saying they're losing land because of erosion. But are they honestly saying that that one week period where we sandbagged three years ago has caused all this erosion? They have no proof of that. Matter of fact, there's all sorts of testimony in the record as to other possible causes. Even their own expert, Mr. Allen, admitted there's a myriad of causes that could have led to that erosion, could have led to their additional flooding since 2008. Not the least of which, the land directly to the north had a berm built. So Mr. Allen, and I can go into some detail on what Mr. Allen testified to, depending on what the court wants, but it's all laid out in both briefs. First off, he concedes you can't divert water. The Christian Rogge calculations that he relies upon to say, well, when this thing was first built, it wasn't meant to take on extra water. I think if you read the facts that we set forth in our brief, you'll clearly see that that's been discredited. Same thing with the annexation agreement. Briefly, let me turn to some of the other arguments. Plaintiffs here have an adequate remedy at law. They have a broad action at law, but they have one. Where a party's damages, when you're dealing, excuse me, where do we adequately be compensated by money damages? You don't get a preliminary injunction. They have the right, and if you look at IPI civil 30.17 and 30.18, whether you're dealing with temporary damage, they get reasonable repairs. If you're dealing with permanent or continual damage, they get the diminution in value. Down below, they admitted, at least a couple of them did, yeah, my property values have suffered because of the additional flooding. There's your diminution in value. There's your adequate remedy in law. Therefore, they shouldn't have gotten this preliminary injunction. Which you referred to there, doesn't that, there are likely to be multiple lawsuits then after each flood? You know what, that's the case law, and you're right. There is a potential there, but based upon the facts and evidence in this case, I don't think there is going to be any lawsuits that can prove that our berm is going to cause any additional flooding. I think Lakelands is willing to take on that risk. There's also not an ascertainable right of protection. That's kind of an argument that says all the parties who join in the suit must be shown that they are entitled to equitable relief. Here they had one plaintiff who didn't even testify. I realize that's kind of a ticky tag argument. However, that's the law, and it hasn't changed since the 1925 case that I cited in my brief. And finally, with respect to the benefits to the plaintiffs, with respect to granting the injunction, with respect to the harm done to the defendants with respect to the injunction, I would argue that they didn't meet that burden either. Because here, as we've shown, with the floods in the past, we've incurred a million dollars worth of damage, at least in that range. They've incurred, according to the testimony entered, $5,000. I would say in those types of circumstances, the harm to the defendants greatly outweighs the harm to the plaintiffs. So, in light of all the above, I'd argue that the preliminary injunction should be reversed, and this matter should be remanded to the trial court for further proceedings. Thank you. Thank you, Mr. Alpert. Mr. Buck. Good afternoon, Your Honor. May it please the Court. Mr. Alpert. Members of the Court, my name is Carl Buck, and I represent Carl Bryant and his fellow plaintiffs and the appellees in this action. We would ask that you affirm the decision of the trial court granting the preliminary injunction because the trial court did not abuse its discretion in granting that preliminary injunction, and we would ask upon that finding that you remand the case back for trial. The first thing I'd like to address in my argument is the standard of review. My opponent, in his brief, raises a standard of review as a hybrid standard. He says that the standard of review is an abuse of discretion and de novo review based on a question as a matter of law or an argument based on a matter of law. I would suggest to this Court that that is not the appropriate standard of review. In my brief, I cite cases, the Cablefish case and the Ford Motor Credit case, which state that the only time in a preliminary injunction appeal that you have a hybrid standard of review is when the court, the trial court, excuse me, is using a statute or reviewing a statute as part of the granting of the preliminary injunction. In this case, there's no argument that there's a statute involved which requires some type of statutory construction or argument as a matter of law. This is a fact case based on clearly established elements of a preliminary injunction. In the Cablefish case, the statute that was at issue was the Service Animal Act and whether or not a child could use a service dog in a school. In the Ford Motor Credit case, it was whether the Uniform Arbitration Act precluded a claim based on a prior lawsuit. And in both those cases, the facts weren't in dispute. The court was, the appellate court was reviewing whether or not the trial court, as a matter of law, had made the correct conclusions based on the undisputed facts. In this case, we have the exact opposite situation. Because of that, I would suggest to you that the abuse of discretion standard is the proper standard of review for this case. The first argument I'd like to address is the adequate remedy of law. It was briefly brought upon or argued by my opponent at the end of his argument, agree with the court in that the standard when you're looking at a drainage case like this or any equitable case is whether or not there's going to be a continuing harm. And in this case, with the propensity as alleged by the plaintiffs for continuing harm, it's not just a simple question of whether or not there's a monetary award that can be received. It's a question of whether or not that continuing harm is going to continue. And the standard that's articulated through the cases when deciding whether or not there is an adequate remedy of law or whether or not, if the court, the case should lie in equity, is whether the relief that can be granted as an adequate remedy of law is clear, complete, and as practical and as efficient as the equitable remedy. And in this case, as in many of the cases that I cite in my response brief, the courts have found that you are not precluded simply because you did have a damage from also seeking to enjoin the person who damaged you from creating further damage. And one of the specific cases is the Myers case. And in that case, the court specifically said, no, you can make a claim for relief, and you can be enjoined from further conduct. So with respect to an adequate remedy of law, I believe that that's been proven. Also, the court in the court's decision cited several cases as well that she relied on. Ascertainable claim for relief, the second moment. This argument is raised by the appellant on the basis that one of the plaintiffs did not testify in the action, and therefore, since there was no direct testimony from that plaintiff, all of the claims failed. My first argument is a procedural argument. The cases that I cited and the cases that were cited by the appellant actually require that a motion to dismiss or some motion be brought before the court so the court can actually determine that. There was no motion made at the close of my case. There was no motion made at the close of the evidence. There was no motion made at the close of the trial. There was no post-trial motion made with respect to the defendant saying this case should be dismissed because this evidence hasn't been presented. So procedurally, I believe the argument's been waived on appeal by the appellant. Setting that to the side for a second and addressing it substantively, we cited in our response brief the testimony from our expert, which said each and every one of the plaintiffs suffered damage and the basis for that damage. And the court in the court's decision also found that each of the plaintiffs were to suffer damage based on the evidence that was presented. And lastly, I would suggest to this court that when you review the briefs, you will see that the defendant's expert unfortunately didn't know where any of the plaintiffs lived along the river, so he had no basis to say where any of them lived. So based on that evidence, I would suggest that the plaintiff's expert's testimony with respect to damage of each of the plaintiffs was certainly not contradicted by the defense. It was relied upon by the court. And substantively, with respect to that argument, that claim is proven. And that's the only argument that's made on whether or not there's an ascertainable claim for relief. With respect to the balance of the hardships, I'm going to save likelihood of success on the merits for last. With respect to balance of the hardships, it's a very interesting argument because the appellant says, well, we've suffered a million dollars of damage. You've only suffered $5,000 of damage. Clearly, the balance of hardship weighs in our favor. Well, the purpose of a preliminary injunction, as you're well aware, is to preserve the status quo. The status quo in this case was that there was no burn. It is undisputed, and it's been proven clearly by the plaintiffs, that the water from the DuPage River, when it overflows, crosses across Plainfield River and goes onto the property of the defendants. That happens. It's been happening. It's been happening for a number of years. In 1996, when this development was built, they were required to build Balloon Lake for compensatory storage because they filled in around that area. And when you fill in around an area that has otherwise had flood relief, which is in a floodway, then you have to provide for compensatory storage. Justice McDade asked, aren't you filling in a catch basin? That's exactly what they were trying to do. And in 1996, that's exactly what was happening. So what they want to do now is say, well, we don't want to have a million dollars worth of damage, so we want to stop all the water from coming onto our property, and we'll send that million dollars of damage worth of water down the river and back onto your property. And that's exactly what their expert testified to, Mr. Allen testified to, and each one of the plaintiffs that testified testified to. What if every time there was some danger of a flood, a rainstorm, they sandbagged at the berm location and had essentially the same effect, according to the evidence? That's the Dickerson case. What do you do then? They're not allowed. Unfortunately, we'd have to probably run in and ask for a TRO every single time they tried to do that. And that's why we're here. We don't want them to sandbag, and we don't want them to build a berm because in the Dickerson case, which is a third district case that we cited, that's exactly what happened. That was an overflow case. That person wanted to build a berm to stop the overflow waters. They did build a berm, and they were enjoined from maintaining that berm because the overflow waters were then diverted back down upon the plaintiff's property. They were damaged. They actually cut a new channel. In our case, we say it's erosion. But they would be prevented from doing that. And this isn't a situation, mind you, where they're putting sandbags, for instance, at the back of their door to prevent water from actually coming into their house. This berm is on their property where the water comes in onto the property into the lake. And the reason that we say that this is so damaging to us is if you can picture this circle as being the lake and this circle as being the property, their defendant's expert testified that this amount of water that goes back down the river, that's not going to hurt the plaintiffs. When I cross-examined him and said, well, what about this amount of water? Because that's what you're really saying. If it's just the lake water that comes in, it's going to fill up the lake, and nobody's going to be flooded. Why would you ever need a berm? It's because the rest of the land floods, and that's the water that they want to stop. That's the water that they want to cast back down upon the plaintiff's lands. When I asked him what amount of water that was, he did not know. It's certainly in excess of 400 million gallons, which is the amount of water that he said would go into the lake itself. So it's in excess of 400 million gallons. The testimony elicited from the plaintiff's expert, Mr. Jeff Allen, who's also an engineer, was that the berm would cause those floodwaters, which would not go across the defendant's lands, which they currently go, back across the road, back into the river, and then back down the river and across the plaintiff's land. They would be traveling at a higher velocity because it would be a greater amount of water. The property and the river would flood at a faster rate, giving them less time to react. And because of the velocity and the faster flooding, the actual flood stage, where the waters are flooded, would last longer. So those were the three effects that he testified to as a result of the berming. Faster velocity, faster flooding, and a longer flood period. Now the plaintiffs that testified, there were three of them primarily. The first one that testified was a man by the name of Frank Bender. He's a doctor. He's lived in Plainfield for 60 years, and he's lived in this specific residence for 57 years. And he's testified that in 1996 when there was a flood and no berm, it took approximately 24 hours. That flood was a 500-year flood. And it took about 24 hours for his property to start to see some flooding. In 2008, which was the source of the sandbagging which caused this dilemma, in 2008 it was a 5 to 6 inch rain and it flooded in 20 hours. It flooded faster with less rain. He's watched his property since 2008 erode on the east bank of the property. Carl Bryant, who lives a few doors down from him based on the map, lived there for 44 years. He's observed the same thing. Karen Rabier, who lives downstream, testified contrary to Mr. Allperson's suggestion that it was her feelings. She saw the way the river flooded in 1996. She never had any flooding before 1996. In 1996, at the 500-year event, the flood water went downstream, and then, per the floodway, backed up and flooded the area, which is what it's supposed to do based on the flood control maps. In 2008, when the berm was put up, the flood waters came straight down the river and straight through the floodway and onto her property. So it changed the actual path of the river. We believe that the evidence in this case did prove a likelihood of success on the merits in each one of the other elements that I spoke about. With respect specifically to the amounts of water that we're talking about, in this case, it's a situation where the defendants want no water. What they say is, well, you get flooded and we get flooded. We don't want to be flooded, and because we don't want to be flooded, the amount of water that we're going to turn back on your property isn't going to make a difference. And we object to that, and those are the facts that are in dispute. In this case, the judge found that we had proven our case. We had proven each one of the elements. And the reason that I would suggest to you that that's important is when Mr. Alpern was going through his recitation of what he thought the standards were, I would suggest to you that the overriding standard is the reasonable standard. The plaintiffs have never taken the position that you can't build any berm, but you can build the berm that they want to do, which is complete flood protection. Those aren't my words. It's their words. On their engineering drawings, that's what it says on one of the notes. The purpose of this berm is complete flood protection. Testimony from one of their defendant residents, complete flood protection. Testimony from their expert, yes, it will keep all the floodwaters out. That's why in this case we would suggest to you that that's not the appropriate standard, that that's unreasonable. You can't keep all the waters out. The waters went there. There was an amount of water that was allotted for in the compensatory storage. There's a certain amount of floodwater that goes onto your property, and you have to allow that amount of water onto your property, and you can't turn it back onto the plaintiffs, causing them damage. Yes, sir. Let me ask you a question about the strategy here. I don't want to get you in a position where you're speaking too specifically, but what kind of proofs would you have at a hearing for a final injunction? With respect to causation? That you did or didn't have a preliminary injunction? At this point, with respect to the proofs that we would have, we would have certainly the testimony from our expert with respect to what those calculations would be with respect to all of the water that travels onto the defendant's property. I mean, that's a key number. Neither the defense expert knew that, and neither our expert knew that. They did calculations based on the compensatory storage figures and the amount of the known quantity of water that went on there. There was a question asked about, well, can you calculate the total amount of water? And the answer is, yeah, you can calculate it based on the area, and neither one of them had done it. So as a practical matter, a very real number would be, what's that total amount of water, and what's that effect? And neither expert has been asked that question. With respect to damages, obviously we would want to provide further evidence with respect to the erosion and the course of the river. Mr. Alpern was trying to suggest that one incident had happened and that it caused erosion for the next three years. If you recall, if you look at the dates of this testimony, it wasn't a year, nearly a year after the event occurred, that the sandbagging occurred, that we had this testimony. So it's not been that long of a period. But with respect to that erosion, we would have further evidence on the erosion. I have to give it some more thought. I know that's for another day, but I'm just curious. But I know that the big number is... Obviously, if there are other things to be done, or to defend against, or whatever. Yeah, there's definitely more evidence to be had. And no depositions or anything have been taken, other than the two experts. Two experts were deposed on their initial reports. There was a report from Mr. Allen. There was a series of correspondence and information provided by Mr. Dressel. But I don't believe there was a subsequent report that was done. So the defendants may supplement. I don't know that. But none of the plaintiffs have been deposed. None of the individual defendants have been deposed. Any other questions? Thank you very much. Thank you. Are you finished? I just wanted to request that you affirm the trial court and send the case back to trial. Thank you. Thank you. And Mr. Albert, I need you to rebut. Just a short one. And I'll take these in the same order he did, because that's how I took notes. With respect to the standard of review, when you're dealing with a preliminary injunction case, it always seems that the courts can play that either way. Because a preliminary injunction is an extraordinary relief. And, you know, there's a requirement that the plaintiff... The burden to get that is very high. So the courts up on appeal that seem to have overturned that always cite that standard and say, well, they didn't meet that standard. When you're up on appeal, generally speaking, it's abuse of discretion. However, where the facts are undisputed and the only legal conclusions are at issue, you've got a de novo standard of review. Here, given Mr. Allen's admission that all the numbers that our expert came up with, you know, and his calculations are accurate, the key facts here are undisputed. I mean, this case is really, when it comes right down to it, this is an expert case. And that's the key testimony right there. That's undisputed. Moreover, to the extent you're dealing with abuse of discretion, I think you have it here because there's no proof whatsoever of causation. That's a required element of their case. They can't prove it. You know, one thing that occurred to me is how far downstream can a plaintiff go and still be allowed to sue? Are you talking one mile? Are you talking two miles? I mean, this water eventually ends up in the Mississippi River. Can somebody down in St. Louis go back and sue my client? Clearly not. I mean, that's absurd. With respect to the next factor, the Myers case, he mentioned that with respect to the adequate remedy of law factor. In that case, if you actually read it, the court did not rule upon the appropriateness of the injunctive relief that was requested. Its focus instead was on the statute of limitations on the nuisance damage claim that had been raised. So I wanted to point that out to the court. With respect to whether my expert knew the plaintiffs or knew where the plaintiffs lived, he knew they were downstream. And, you know, there was also, if you look on Defense Exhibit 1, I had each one of the plaintiffs come down and mark on the big map, if you will, where exactly their residence was located, and they were all downstream. That's all you need to know at this point. With respect to the balance of the hardships, you know, he mentioned something about how the lake was required to have compensatory storage. That's not correct. If you go back, this gets back into the testimony about the Christian Rohe calculations, which was an engineering firm way back when, when they were first developing the Lakelands property. And, you know, there Mr. Allen discovered these calculations and said, aha, these must mean that the lake was supposed to take on compensatory storage for the river. Well, first off, there's a clear testimony these are separate watersheds, that the lake is supposed to take on the Lilly Cash Creek watershed, and it must be kept separate. But second off, there was nobody from Christian Rohe who testified. Mr. Allen talked to somebody from Christian Rohe, but he didn't remember anything about the calculations. He couldn't give him any information about them whatsoever. The calculations themselves mention the word lagoon as being, you know, you're going to dig this lagoon. Well, the lagoon, as it's today, there was testimony that the lagoon portion is over in the other corner of the property that is closest to the Lilly Cash Creek watershed. So if these were compensatory storage calculations, they were for Lilly Cash Creek. But third, they weren't dealing, these were standard cut fill calculations, not compensatory storage calculations. These didn't even mention, this comes out in the testimony of their expert in cross-examination, these didn't even mention the base flood elevations. Well, when you're talking about compensatory storage, you have to talk, you know, that's one of those numbers you need. And I asked Mr. Randall, and I said, well, you know, you've done other projects before. I said, if somebody submitted some calculations to you that were meant to be compensatory storage and they didn't have the base flood elevation, would you accept them? And he said no. Thank you. So clearly these were not compensatory storage, and there's no proof whatsoever that our lake was ever meant to take on storage from the water. With respect to the amount of water. The same question that I asked Mr. Buck about the final injunction hearing. Would you be presenting additional proofs then? And again, I don't want to get into your work product. I understand. I mean, my expert testimony is pretty clear. I mean, I might clarify it with a supplemental opinion from him, but it's pretty straightforward. Obviously I'll depose the plaintiffs, but I don't see how the proof here is going to change much. The plaintiffs are downstream. We're upstream. We've got the numbers that show how much water is diverted. I don't see how the facts are going to change all that much. I think it's pretty clear where this case is going. So I don't pretend to put on air. At this point, I don't foresee me having any additional testimony or witnesses than I've already got. And briefly, I'll finish up. Mr. Allen, he mentioned during his argument, faster velocity, faster flooding, longer flood period. Mr. Allen has no basis for any of that testimony. None. He's done no quantitative analysis at all. He admits that. He says basically when you boil it down, it's just because additional water is hitting the berm and going back down the river. That's what he bases everything on. Well, that's not enough. With respect to the 08 flood, it was not a one-day flood of five to six inches. It was a two-day rainfall, and indeed, the USGS gauge at the Bowling Brook upstream river gauge showed that that was the highest amount of water in the river at any time, ever. It was a two-day rainfall, and it was – and I forget the number. It's in the briefs. It's like 13 or 14 inches up in Wheaton. Well, that water comes down the river. The word feeling came directly from the plaintiff's testimony. Finally, with respect to the reasonable standard, what standard to apply, he says, well, of course, we never said that you can't do it entirely. That's exactly what they've been saying. He says, well, it should be the reasonableness standard. If they've been arguing for the reasonableness standard, then why isn't even the Templeton case cited in their brief? I mean, clearly, they've been arguing all through this thing that we shouldn't be allowed to do anything whatsoever. We put one drop of water back into that river, it's going to affect them. That's their expert testimony. That's been their case. I think if you apply the reasonableness standard or if you apply the standard that sparked Steve Gray, I don't think there's any doubt that you should have to reverse the preliminary injunction that's been issued. Thank you. Thank you, Mr. Alpern. And thank you both for your arguments today. We will take this matter under advisement and get back to you with a written disposition within a short day.